# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 17, 2022

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 17, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 99301-7 |
|  | ) |  |
| K.W., a minor child. | ) | EN BANC |
|  | ) |  |
|  | ) | Filed : February 17, 2022 |
|  | ) |  |

MONTOYA-LEWIS, J.— The Department of Children, Youth, and Families (Department) and the dependency court system serve to provide protection for children who are in unsafe situations with caregivers who are unable to provide safe and stable parenting. When children have to be removed from their parents, the legislative scheme requires that children be placed with relatives first to reduce the disruption children face upon parental removal. In this case, K.W. was removed from his long-term placement with his relative, "Grandma B.," after she took a one-day trip and did not notify the social worker of the trip. The consequence of this removal resulted in tremendous upheaval in K.W.'s life and violated the requirements of RCW 13.34.130. Though K.W. was legally free, the placement

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

preferences set out in the statute still applied, and the court erred in failing to apply them and failing to place K.W. with relatives. We reverse.

## FACTS AND PROCEDURAL HISTORY

### A.    Factual Background

K.W. is fortunate to have an extensive support system of relatives and family friends who have been closely involved in his life since he was born in 2013. He is closely bonded with dozens of family members, including his siblings, cousins, and older relatives across generations who all live in the Seattle area. His cousins are like siblings to him, and two women relatives have helped raise him since he was a baby. K.W. and his family are Black. K.W. regularly spent time with his extended family from a young age, attending family gatherings and significant cultural events together, like the annual Martin Luther King Jr. march and rally.

In 2014, when K.W. was about a year old, his mother reached out to her cousin for help caring for K.W. K.W. refers to this woman as his "grandma," and we refer to her as "Grandma B." Grandma B. welcomed K.W. into her home, and he remained in her care without interruption until December 6, 2019. In 2016, when K.W. was about three and a half years old, a juvenile court found K.W. and his siblings dependent. The dependency court continued K.W.'s placement with Grandma B. at shelter care and disposition in 2016, and repeatedly throughout the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

next several years of the dependency. Grandma B. has effectively raised K.W. since infancy, with the love and support of many other relatives.

Grandma B. has extensive experience working with children both professionally and at home. She has decades of experience as a teacher at an early childhood learning center for children experiencing the traumatic effects of homelessness. In addition to raising her own children, she has helped care for other children of friends and family. Grandma B.'s adult son, Mr. W., lived with her for several years and also helped raise K.W. since he was an infant; one of Mr. W.'s children is the same age as K.W., and the two children are very close.

In 2018, Grandma B. expressed interest in being a permanent placement for K.W. However, in early 2019, she told the Department she could not be a permanent placement for K.W. because she needed to go back to school to get a certificate in order to keep her job. The Department approved continued placement with her.

K.W.'s great aunt, whom we refer to as "Aunt H.," also helped raise K.W. since he was an infant. Aunt H. worked as a bus driver and as a certified home care aide worker for Seattle and King County's Aging and Disability Services. She also helped relatives and friends manage their finances and Social Security benefits. Like Grandma B., Aunt H. had helped raise children of family members, as well as her own. Aunt H. also expressed interest in being a permanent placement for K.W., but

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

in mid-2019, she informed the Department she could not be a permanent placement for him because of her work schedule, which required early morning driving shifts.

K.W.'s father's parental rights were terminated in 2018. In March 2019, K.W.'s mother's parental rights were terminated,[1] and K.W. was declared legally free.[2] The Department began to search for adoptive families for K.W. because no relative could be a permanent placement option at that time. In November 2019, the Department identified two couples as potential adoptive placements. Throughout this process, K.W. continued to be placed with Grandma B.

### 1. *The Department Removes K.W. from Relative Care*

On Friday, December 6, 2019, after putting K.W. on the bus to school, Grandma B. left for a day trip to attend her niece's graduation, about three hours away in northwest Oregon. She planned to return later that evening and arranged for her son, Mr. W., to pick up K.W. Mr. W.'s daughter and K.W. attended the same after-school day care, and Mr. W. was on K.W.'s approved pickup list. They planned for K.W. to stay at Mr. W.'s house until Grandma B. returned later that evening.

---

[1] K.W.'s mother's parental rights were later restored, and he has since been placed with her.

[2] A child is considered "legally free" when no one holds parental rights and the child is legally free for adoption. *See* RCW 13.34.210.

While Grandma B. was driving to Oregon, a department social worker sent her a text message to see if she would be available to meet the following Wednesday. Grandma B. responded, "I am out of town but I will connect with you when I am back next week." 4 Clerk's Papers (CP) at 802. As it was Friday afternoon, Grandma B. intended to get back in touch with the social worker the following Monday. The social worker texted Grandma B. back, "Who is [K.W.] with while you're out of town?" *Id.* Grandma B. did not respond immediately because she was driving. The social worker did not call Grandma B. or any other relative at that point, but she contacted K.W.'s school. The school staff said K.W. had already gotten on the bus to day care but mentioned that he had a cell phone and tried to call a person labeled "Mom" that day. 4 CP at 795. The social worker went to the day care and spoke with K.W., who said he was staying with Aunt H. for six days. Concerned that Grandma B. might have left K.W. for six days, that Aunt H. might not have childcare while she was at work, and that K.W. might have contact with his mother, the social worker took him into custody.

The Department and the court-appointed special advocate (CASA) repeated these allegations multiple times in the record over the next several months. Grandma B. consistently stated that she had always planned to return to Washington the same day and pick up K.W. from her son's house, and she submitted an e-mail from her

5

*In re Dependency of K.W.*
No. 99301-7

supervisor confirming that she requested one day off work and a receipt showing that she rented a car for one day.

When Grandma B. learned that K.W. had been taken into department custody on the afternoon of December 6, she immediately drove back to Seattle. She tried to call the social worker to find out where K.W. was but got no answer, and when she saw the missed text message, she responded that she was on her way back. These events all happened within the span of two hours.

The Department placed K.W. in respite care for the weekend,[3] and the following Monday, moved K.W. to the home of a prospective adoptive family.[4] Aunt H. contacted the Department that Monday to inform them she was able to be a permanent placement for K.W. because her work schedule had changed. She also pointed out that she was a certified home care aide, submitted a background check, and submitted a home study that had been completed in 2013. The Department informed her that K.W. was already placed with a prospective adoptive family.

---

[3] While in respite care, K.W. said he was scared of returning to Grandma B.'s home, though he did not say why. He later filed a declaration saying that he felt safe with his grandma, he did not know why he said he felt unsafe, and he considered her house his home.

[4] While in this first prospective adoptive family's care, K.W. said he did not want to go back to Grandma B.'s home because he was scared of a man named Mr. R. He said that Mr. R. is "rude" and hits him, but that Mr. R. does not live at Grandma B.'s home. 4 CP at 797. In his subsequent declaration, K.W. retracted this statement as well, stating that it was a long time ago when Mr. R. was mean to him, and he felt safe in Grandma B.'s home.

Also, while K.W. was with this prospective adoptive family, his braids were cut off.

6

*In re Dependency of K.W.*
No. 99301-7

However, within less than one week, that family informed the Department they would not adopt K.W. and asked for him to be removed from their care.

## 2. *K.W.'s First Request To Return to Relative Care*

On December 20, 2019—two weeks after his abrupt removal from his relatives—K.W. filed a motion to be returned to Grandma B. or, in the alternative, to be placed with Aunt H. or Mr. W. K.W. filed a declaration expressing his strong desire to return to his relatives. Grandma B., Aunt H., and Aunt H.'s son submitted declarations in support of returning K.W. to relative placement.

The court held a hearing on December 24. K.W.'s attorney underscored that K.W. had lived with Grandma B. for almost his entire life before he was suddenly removed from her care. He stressed K.W.'s strong connections with his family; he also argued there were "no true safety issues" with the relatives and that Grandma B. and Aunt H. would satisfy the background check and home study requirements without issue because of their jobs and prior experience caring for other children. Report of Proceedings (RP) (Dec. 24, 2019) at 15, 27. The Department opposed modifying placement to a relative without a department home study, due to alleged safety concerns about each of K.W.'s requested relative placements, including concerns that his relatives were permitting K.W. to have contact with his mother.[5]

---

[5] However, the Department had approved of supervised visits with K.W.'s mother throughout the dependency as recently as two months earlier and had approved an open adoption agreement that included visitation.

7

*In re Dependency of K.W.*
No. 99301-7

The CASA reported that K.W. was having emotional outbursts at school since his removal from Grandma B.'s care—but she argued that K.W. should be placed with a prospective adoptive family because he needed permanence.

The court authorized the Department to place K.W. with Aunt H. It also "urged [the Department] to expedite the completion of a home study" in the order but authorized the placement with Aunt H. without the completion of a home study. 4 CP at 814. It further ordered the Department to meet with Aunt H. to address its concerns and to "investigate and give priority to permanent placements with a relative." *Id.* at 815. However, it also authorized the Department to place K.W. in licensed foster care.

Immediately following the hearing, a department social worker allegedly told K.W.'s attorney and Aunt H. that they would not place K.W. with Aunt H. until a home study was completed, despite the court order. Arguing that the Department was acting in bad faith and the comments demonstrated their animus against the relatives, K.W.'s attorney requested the court to order placement with Aunt H. once the background check was completed. The court reiterated that a home study was not required but declined to modify its order. The Department moved K.W. to the home of another prospective adoptive family on December 27, 2019.[6] This was the

---

[6] While K.W. was placed with this prospective family, his relatives requested through K.W.'s attorney that the Department allow K.W. to attend the Martin Luther King Jr. march and rally in January. K.W. had attended every year with his family, since the age of two. The

8

third unfamiliar home K.W. was sent to in three weeks since he had been removed from his relatives' care.

### 3. *Relatives' Efforts To Satisfy the Department*

Desperate to bring K.W. home to the love, stability, and familiarity of his family, several relatives immediately began working to satisfy the Department's concerns about placing K.W. with them.

#### a. Aunt H.

Since the Department refused to place K.W. with Aunt H. before she completed a home study, Aunt H. began the home study process immediately. She submitted applications for a new background check and home study the same day of the December 24 hearing. Pursuant to the court's order, Aunt H. met with the Department social worker on January 6, 2020, to discuss the Department's concerns regarding placement with her. The Department's concerns seemed to be focused on Aunt H.'s prior contact with the Department while caring for other children.

First, the Department raised concerns about the time when her grandniece was in her care in 2007. Aunt H. had begun a home study for her grandniece with the Department but did not complete it when she opted to do a home study through a private agency instead. The Department was concerned that Aunt H. had allowed

---

Department denied the request, citing their inability to supervise his attendance and concerns about "tensions" with K.W.'s mother and extended family. *Id.* at 894.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

her grandniece to have unsupervised visits with her biological mother. Aunt H. clarified that she permitted only supervised visits. The Department was also concerned about a man they alleged was Aunt H.'s live-in boyfriend, who had a criminal history and whose children were also dependent. Aunt H. explained that the man was a family friend, not her boyfriend, and he did not live with her; he received mail at her house for a time when he was experiencing housing instability.

Second, the Department was concerned by a couple of Child Protective Services investigations in the intervening years. In 2008, there was an investigation regarding allegations of sexual abuse of a child in Aunt H.'s care. The allegations were determined to be unfounded. In 2015, there was an investigation when her grandson was living with her. The child was found outside the home unattended while Aunt H. was at work and she had left the child in his uncle's care for an hour. Drugs and a loaded gun were found in the uncle's bedroom, and the uncle had a criminal history. The uncle was only temporarily staying with Aunt H., and Aunt H. kicked him out of the house immediately after this incident. She denied knowing about the drugs, guns, and criminal history, and stated she would not have allowed the drugs or guns in her home if she had known about them. In 2018, there was an investigation with no specific allegations of abuse, negligence, or risk. Her grandson was on the phone with his birth mother, who thought she heard a man count to three, a thud, and then a child screaming. Aunt H. explained to the Department that the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

child's mother suffered from mental illness and that there was no man in the home; she also located a police report confirming that the police found no man in the house and had no concerns for the child's safety. More recently, another family member had reported that Aunt H.'s grandson displayed sexualized behaviors toward other children in the family, and the Department was concerned K.W. would potentially share a bedroom with the grandson. Aunt H. said she had never seen any such behavior and said she would never permit any inappropriate behavior. She also pointed out that she had completed a home study to gain custody of her grandson.

Third, the Department was concerned about Aunt H.'s hopes for K.W. to reunify with his parents. In May 2019, when she informed the Department that she could not be a permanent placement for K.W. at that time, she noted that his parents were progressing well, and she hoped that the Department would consider placing K.W. with them. The Department informed her that K.W.'s mother's and father's parental rights had been terminated, so they would not be a placement option. Aunt H. had not known that their parental rights had been terminated until then, and she clarified that she would allow K.W. to return to them only if court ordered. She also stated that she would be willing to adopt K.W. if his mother's and father's parental rights were not reinstated.

At the conclusion of the January 2020 meeting, Aunt H. asked if K.W. could be placed with her, in light of the court order that authorized placement with her

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

before a home study was completed. The social worker responded that they would not move K.W. before she completed a home study. After this meeting, the Department received notice that Aunt H. had passed the background check. Aunt H. met with the home study evaluator on January 31, 2020, and they began the home study process. Aunt H. also began training to become a licensed foster care parent.

b. Grandma B.

In late January, Grandma B. informed the Department she could also be a permanent placement option for K.W. and requested a home study. The Department told her that it had a policy of doing only one home study at a time and that because it was engaged in the home study process for Aunt H., it would not begin a home study for Grandma B. until Aunt H.'s was complete. Therefore, Grandma B. began the process to obtain a private home study and began training to become a licensed foster care parent.

The Department had concerns about Grandma B.'s history as a victim of domestic violence about 10 years earlier. In 2011, Grandma B.'s son (Mr. W.) obtained a protection order against Grandma B.'s husband, Mr. R. Grandma B. and Mr. R. separated at that time, and they began a dissolution of marriage that was never finalized. Grandma B. informed the Department that Mr. R. was her estranged husband and had not lived with her in since 2011. Mr. R. submitted letters and receipts for rent indicating his separate residence dating back to 2012. Grandma B.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

also explained that Mr. R. came to the home only to see their daughter, who lived with Grandma B., and Grandma B. was willing to get a divorce.

The Department also believed that Grandma B. would not be a suitable placement for K.W. because she might allow unsupervised visits with his biological parents. The Department was concerned that Grandma B. allegedly permitted K.W. to have contact with his parents and left him in their care on December 6, 2019, even though their rights were terminated. Grandma B. stated that K.W. had not had contact with his father since a social worker informed her that his parental rights had been terminated. She also clarified that she allowed K.W. to speak to his mother only under her supervision and reiterated that the plan for December 6, 2019, had always been for K.W. to stay with her son, Mr. W., for the afternoon, not with K.W.'s parents.

c.      Mr. W.

In December 2019, Mr. W. also contacted the Department to express his desire to be a permanent placement and adopt K.W. A social worker and the CASA observed appropriate interactions between K.W. and Mr. W. and found Mr. W.'s home clean and appropriate. But when a department social worker interviewed Mr. W., he felt that the social worker was discouraging him from continuing the process because they believed he would not be able to pass a home study. The Department completed a background check on Mr. W. and learned that a previously dismissed

13

*In re Dependency of K.W.*
No. 99301-7

DUI (driving under the influence) charge from a year earlier had recently been refiled. The Department was also concerned about other criminal allegations from 2011 and 2012, and his report that someone had stolen his firearm in 2015. The Department concluded that it would not consider placing K.W. with Mr. W. until the DUI charge was fully resolved. It also determined that his background check would require an additional review before deciding whether a home study could even occur and, therefore, he could not be an immediate placement option.

### 4.     *K.W.'s Second Request To Return to Relative Care*

On February 13, 2020, K.W. filed another motion to be returned to either Grandma B. or Aunt H. as well as another declaration, again expressing his desire to return to his relatives. Twenty relatives and family friends filed declarations in support of his motion, describing the extended family's close bonds. K.W. also included a report by a clinical psychologist about placement best practices and the psychological and developmental impact of relative placement. Grandma B. and Aunt H. both filed declarations meticulously responding to the Department's concerns about permanent placement with them and detailing their efforts to complete home studies. Grandma B. also provided a copy of the completed private home study recommending her as a suitable placement for K.W. The social worker who prepared it filed a declaration explaining that it met all the statutory requirements for a preplacement adoption home study report.

14

*In re Dependency of K.W.*
No. 99301-7

The CASA filed a motion requesting to modify the December order to delay placing K.W. with a relative "until they have been fully vetted and passed the home study process" and requesting that K.W. remain in foster care. 5 CP at 1018. The CASA reported that K.W. continued to struggle in school since his parents' rights were terminated and since his removal from Grandma B.'s care. But she provided the court with Grandma B.'s, Aunt H.'s, and Mr. R.'s civil court histories and argued it was in K.W.'s best interests to stay with the prospective adoptive family.

The Department also opposed placing K.W. with a relative until that relative passed a home study. The Department argued that there is no statutory preference for relative placement once a dependent child becomes legally free and that permanence is the highest priority for a legally free child. Since the relatives had previously not been able to adopt K.W. and had only recently offered to be permanent placements for him after K.W. was removed from Grandma B.'s care, the Department did not want to place K.W. with a relative until they decided that would be his final placement, which could be determined only after a home study.

The Department and the CASA also opposed Grandma B.'s private home study, stating that it did not meet Department standards. Specifically, the Department was concerned that the private home study did not include Grandma B.'s estranged husband as a co-applicant. It argued that Mr. R. was a safety concern because of his domestic violence history in 2011 and because of statements that

15

*In re Dependency of K.W.*
No. 99301-7

K.W. had made about him and subsequently retracted. The Department would require both Grandma B. and Mr. R. to complete a department home study, which it would not begin before completing Aunt H.'s.

In a March 12, 2020, hearing, the court acknowledged that "it is clear . . . that [K.W.] has a number of people who really care about him" but said that it was "particularly concerned about stability" and concluded that "stability is equally and sometimes more important" than living with relatives. RP (Mar. 12, 2020) at 86. The court ultimately decided it was in K.W.'s "best interest" to remain in his current potential adoptive foster placement. *Id.* at 88. Therefore, the court denied K.W.'s motion and granted the CASA's motion to delay relative placement until Grandma B. or Aunt H. was "fully vetted with a Department approved home study." 6 CP at 1364.

K.W.'s counsel reminded the court that Grandma B. had completed an adoptive home study through the independent social worker. However, the court said, "The information that was provided was not completely accurate." RP (Mar. 12, 2020) at 90. When K.W.'s counsel asked what information was inaccurate, the court simply said it would not argue with him. The court did not explain why it found the private home study inadequate.

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of K.W.*
No. 99301-7

B.    Procedural History

K.W. filed a motion for discretionary review of the March order in the Court of Appeals.  The court denied review and denied K.W.'s motion to modify that decision.  K.W. then sought discretionary review in this court, which we granted.[7] Two amici curiae briefs were filed in support of K.W.: one on behalf of K.W.'s mother and the other on behalf of the Washington Defender Association, Smith Law LLC, American Civil Liberties Union of Washington, Fred T. Korematsu Center for Law and Equality, Legal Counsel for Youth and Children, the Mockingbird Society, and Treehouse (WDA et al. Amici).

ANALYSIS

A.    Dependency and Placement Statutes

As a preliminary matter, the parties dispute which standard governs the placement of a legally free dependent child, such as K.W.  The meaning of a statute

---

[7] The Department opposed review, arguing, in part, that the case was moot because K.W. had been returned to his mother's care when her parental rights were reinstated.  *See supra* note 1. Generally, this court will not review a moot case unless it presents issues of continuing and substantial public interest.  *In re Marriage of Horner*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004). We consider "whether the issues are of a public or private nature, whether an authoritative determination is desirable to provide future guidance to public officers, . . . whether the issues are likely to recur," "the likelihood that the issue will escape review[,] and the adverseness and quality of the advocacy."  *In re Dependency of Z.J.G.*, 196 Wn.2d 152, 161 n.7, 471 P.3d 853 (2020). Questions about how our courts resolve competing interests in child welfare cases are of a public nature, and the vigorous debate about preference for relative placement and dearth of applicable case law indicate that public officers would benefit from authoritative guidance on the matter. Further, placement decisions occur every day in our courts but are likely to evade review due to their interlocutory nature.  Last, the advocacy has been genuinely adverse and includes briefs from numerous amici curiae. This case satisfies each consideration for establishing an issue of continuing and substantial public interest.  *Id.*

17

*In re Dependency of K.W.*
No. 99301-7

is a question of law we review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). We determine the plain meaning of a statute based on "the statute and related statutes." *Id.* at 11. The Washington Juvenile Court Act recognizes that children have a "right to conditions of basic nurture, health, [and] safety." RCW 13.34.020. "The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter." *Id.*

When a child is found dependent, the court must enter an order indicating whether the child will remain in the home or be removed "into the custody, control, and care of a relative or other suitable person, the department, or agency responsible for supervision of the child's placement." RCW 13.34.130(1)(b). The statute governing placement of a dependent child expresses a strong preference for placement with relatives:

> The department *may only place a child with a person not related to the child* as defined in RCW 74.15.020(2)(a)[8] . . . when the court finds that such placement is in the best interest of the child. Unless there is reasonable cause to believe that the health, safety, or welfare of the child would be jeopardized or that efforts to reunite the parent and child will be hindered, the child *shall* be placed with a person who is willing, appropriate, and available to care for the child, and who is: (I) Related to the child as defined in RCW 74.15.020(2)(a) with whom the child has a relationship and is comfortable; or (II) a suitable person as

---

[8] RCW 74.15.020(2)(a)(i) specifies people related to the child, including "[a]ny blood relative, including those of half-blood, and including first cousins, second cousins, nephews or nieces, and persons of preceding generations as denoted by prefixes of grand, great, or great-great." Aunt H. is K.W.'s great aunt and Grandma B. is his mother's cousin.

18

*In re Dependency of K.W.*
No. 99301-7

described in subsection (1)(b) of this section.[9] The court *shall* consider the child's existing relationships and attachments when determining placement.

RCW 13.34.130(3) (emphasis added). Thus, the Department is authorized to place the child with someone other than a relative who has a relationship with the child only if relative placement would jeopardize the child's health, safety, or welfare. *Id.* Further, "[p]lacement of the child with a relative or other suitable person as described in subsection (1)(b) of this section *shall be given preference by the court*." RCW 13.34.130(6) (emphasis added). This statutory scheme makes it clear that both the Department and the courts are directed by the legislature to preserve the family unit and, when unable to do so, to place the child with family members, relatives, or fictive kin before looking beyond those categories to nonrelatives.

During the course of a dependency, the court is required to review the child's status at least every six months to determine whether court supervision should continue. RCW 13.34.138(1). Among other things, if the court concludes the dependent child should not be returned to their parents' home or homes, it must also

---

[9] Previously, RCW 13.34.130(1)(b) authorized placement only with relatives or in the Department's custody. *See* former RCW 13.34.130(1)(b) (LAWS OF 2007, ch. 413, § 6). In 2009, the legislature expanded this authority to include "a relative or other suitable person." LAWS OF 2009, ch. 491, § 2(1)(b). The Department recognizes people who are not relatives by birth or law but who have kinship relationships as "suitable person[s]" if they have a preexisting relationship with the child or family, they are available and willing to safely care for and nurture the child, they pass the required background checks, and the child is comfortable with them. WASH. STATE DEP'T OF CHILDREN, YOUTH & FAMILY, POLICY NO. 4527, "Kinship Care: Searching for, Placing with, and Supporting Relatives and Suitable Other Persons," (revised July 23, 2017) https://www.dcyf.wa.gov/4500-specific-services/4527-kinship-care-searching-placing-and-supporting-relatives-and-suitable [https://perma.cc/K72A-PFWD].

19

*In re Dependency of K.W.*
No. 99301-7

determine "[w]hether preference has been given to placement with the child's relatives if such placement is in the child's best interests." RCW 13.34.138(2)(c)(ix). This means that the dependency court is charged with actively ensuring that relative placements have been fairly evaluated. This is an active process required at each hearing. *Id.* Making a finding that no such family placements exist at one hearing does not mean that the inquiry ends: the statute contemplates that the inquiry is ongoing, recognizing that family circumstances change, as they so often do, and as they did in this very case. *Id.*

Although dependent children are very often placed somewhere other than their parents' homes, parental rights remain intact during a dependency. However, if the Department ultimately concludes that parental rights to the dependent child should be terminated, the court may enter an order terminating parental rights. RCW 13.34.180(1), .190. At that point, if "there remains no parent having parental rights," the child is considered legally free, and

> the court shall commit the child to the custody of the department . . . for the purpose of placing the child for adoption. If an adoptive home has not been identified, the department shall place the child in a licensed foster home or take other suitable measures for the care and welfare of the child.

RCW 13.34.210. While the termination of parental rights authorizes the Department to identify and place the child in an adoptive home, it does not put an end to the dependency; a child who is legally free remains dependent until the court concludes

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that supervision should not continue. *Id.*; RCW 13.34.138(1). Many children remain legally free after their parents' parental rights have been terminated. For example, in 2020, of the children who became legally free, 32 percent had adoptions completed within six months of being legally free. WASH. STATE CTR. FOR COURT RESEARCH, DEPENDENT CHILDREN IN WASHINGTON STATE: CASE TIMELINESS AND OUTCOMES 2020 ANNUAL REPORT 21 (2020), https://www.courts.wa.gov/subsite/wsccr/docs/2020DTR.pdf (hereinafter DEPENDENT CHILDREN IN WASHINGTON STATE 2020 ANNUAL REPORT). That means that 68 percent of legally free children remained legally free for at least six months after their parents' parental rights were terminated. *Id.* While many of those children may be in permanent placements, the data do not assure that.

K.W. and the Department appear to agree that RCW 13.34.210 governs the custody of legally free dependent children, but they disagree on whether the preference for relative placement expressed by the legislature at various stages of dependency are among the "suitable measures" the court must take at that time. *See* RCW 13.34.060(2) (shelter care), .065(5)(b) (shelter care hearing), .130(1), (6) (disposition). All amici argue that the dependency disposition statute, RCW 13.34.130—which explicitly states a strong preference for relative placement— governs the placement of a dependent child, whether legally free or not, unless and until there is a "change in circumstance." *See* RCW 13.34.130(6), .150.

We consider the statutory scheme as a whole when determining legislative intent. *Campbell & Gwinn*, 146 Wn.2d at 11-12. A child remains dependent even after parental rights have been terminated. RCW 13.34.138(1), .210. During dependency, the legislature requires courts and the Department to prioritize placement with relatives "[u]nless there is reasonable cause to believe that the health, safety, or welfare of the child would be jeopardized or that efforts to reunite the parent and child will be hindered." RCW 13.34.130(3). One of the primary goals in dependency proceedings is the child's stability, and the standards governing a child's placement should not change at each stage of a dependency. *See* RCW 13.34.020. When a dependent child becomes legally free, the Department is authorized to identify an adoptive home and to place the child in licensed foster care "or take other suitable measures for the care and welfare of the child." RCW 13.34.210. Looking to the statutory scheme as a whole, we conclude that the legislature intended "other suitable measures" to be those expressed throughout the statutory scheme for child dependency and termination, including the placement preferences stated in RCW 13.34.130(3): "the child shall be placed with a person who is willing, appropriate, and available to care for the child, and who is[ a relative or another] suitable person" with whom the child has a relationship and is comfortable, and the court "shall consider the child's existing relationships and attachments when determining placement." Therefore, the preference for relative

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

placement and the requirement for the court to consider existing relationships and attachments continue to apply to a dependent child once legally free. RCW 13.34.130(3), (6).

> B.     Placement with Relatives

In a dependency proceeding, we review a court's decision regarding the child's placement for an abuse of discretion. *In re Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994). "A court abuses its discretion if the decision is manifestly unreasonable, or based on untenable grounds or untenable reasons." *In re Dependency of M.R.*, 166 Wn. App. 504, 517, 270 P.3d 607 (2012). A dependency court abuses its discretion when it makes a placement decision without considering all the relevant factors. *A.C.*, 74 Wn. App. at 279.

When making placement decisions, courts "must be mindful of the statutory scheme, and particularly the legislative preference for placements that least disrupt a child's attachments and sense of stability." *In re Dependency of J.B.S.*, 123 Wn.2d 1, 12, 863 P.2d 1344 (1993). "A child who has been removed from [their] home has a right to preferential placement with a relative or known suitable adult." *In re Dependency of S.K.-P.*, 200 Wn. App. 86, 117, 401 P.3d 442 (2017), *aff'd sub nom. In re Dependency of E.H.*, 191 Wn.2d 872, 427 P.3d 587 (2018); *see also* RCW 13.34.130(3); *McKinney v. State*, 134 Wn.2d 388, 404, 950 P.2d 461 (1998) ("If an out of home placement is necessary, first priority for placement is given to the child's

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

relatives." (citing RCW 13.34.130(1)(b))). Changes in custody should be minimized because of the importance of the "'continuity of established relationships.'" *J.B.S.*, 123 Wn.2d at 12-13 (quoting *McDaniels v. Carlson*, 108 Wn.2d 299, 312, 738 P.2d 254 (1987)). In determining an appropriate placement, the best interests of the child are "paramount." *Id.* at 11. Yet, "the criteria for establishing the best interests of the child are not capable of specification" because each case is "largely dependent upon its own facts and circumstances." *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

In *J.B.S.*, this court reversed a juvenile court order removing a dependent child from a foster family in Washington State who facilitated visits with his mother, to place him in the custody of his father, who had been deported to Mexico after serving time in prison for drug trafficking and who had a limited relationship with the child. 123 Wn.2d at 3, 10 n.5. The mother, though young at the time of the birth of the child and the dependency, had resolved most of the issues that gave rise to the dependency. *Id.* at 6-7. Both parents sought return of the child; return of the child to the father would mean the child would be limited in his ability to see his mother because the father could not travel legally into the United States. *Id.* The trial court observed that placing the child with his estranged father in another country would likely cause the child separation anxiety and trauma, but it erroneously believed that RCW 13.34.020 required the child to be placed with an available parent regardless

24

of numerous indications that such a placement would not be in the child's best interest. *Id.* at 8. Although the case involved competing desires of parents who retained parental rights to the dependent child, the *J.B.S.* court's guidance on the considerations that should inform placement decisions is relevant to placement decisions more generally, including when the child is placed out of the home and when relatives are afforded preference. *See* RCW 13.34.130(3), (6). The court explained that considerations should include "the psychological and emotional bonds" between the child and their current caregivers, "the potential harm [the child] would suffer if effectively severed from contact with these persons," the nature of the child's attachment to the prospective caregiver, the prospective caregiver's history and current circumstances, "and the potential effect upon [the child] of an abrupt and substantial change in [their] environment." *J.B.S.*, 123 Wn.2d at 11; *see also* RCW 13.34.130(3) ("The court shall consider the child's existing relationships and attachments when determining placement."). The court also explained that while courts have discretion to consider criminal history and immigration status, neither of those factors can be dispositive. *J.B.S.*, 123 Wn.2d at 11-12; *see also M.R.*, 166 Wn. App. at 518-20 (abuse of discretion to remove a child from the care of relatives he had close bonds with based on their status as undocumented immigrants and the mere possibility of deportation). More than anything, though,

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of K.W.*
No. 99301-7

*J.B.S.* stated that "the *child's* best interests should be paramount." 123 Wn.2d at 11 (some emphasis added).

The legislature has recognized that placement with relatives will very often support the child's best interests. RCW 13.34.130(3) (requiring the Department to place a dependent child with a relative "[u]nless there is reasonable cause to believe that the health, safety, or welfare of the child would be jeopardized" and permitting it to place a dependent child with someone other than a relative *only* when doing so would be in the best interests of the child).

> Children adjudged dependent often suffer emotional damage from the traumatic experience of being removed from their homes and placed with strangers. Recognizing this potential harm, the Legislature seeks to place a dependent child in a familiar and comfortable environment as soon as possible after a court makes a dependency determination in order to minimize any adverse effects to the child. Relatives of the dependent child can often provide such an environment, and their relationship to the child gives a preliminary assurance that the child will be safeguarded from harm. The statutory scheme, which favors placement of dependent children with relatives, clearly reflects that legislative goal.

*Babcock v. State*, 116 Wn.2d 596, 656, 809 P.2d 143 (1991); *see also* LAWS OF 2021, ch. 211, § 2 (recognizing that "Black and Indigenous children are still disproportionately removed from their families and communities" and amending shelter care statutes to reduce the removal of children from their homes in the first instance and strengthen the preference for placement with relatives when out-of-home placement is necessary).

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of K.W.*
No. 99301-7

While relative placement will not necessarily be in the child's best interests in every single case, ample evidence supports this legislative preference as one that will often minimize the trauma to the child, particularly when the child has existing relationships with the relatives. "[T]he vast majority of children in foster care have relative or fictive kin relationships that are of great value to them," and nurturing and protecting those relationships increases the chances for children to achieve permanency because "[w]hen these relationships are prioritized, protective factors are increased, which promotes current and future well-being." ADMIN. FOR CHILDREN & FAMILIES, U.S. DEP'T OF HEALTH & HUMAN SERVS., ACHIEVING PERMANENCY FOR THE WELL-BEING OF CHILDREN AND YOUTH 10 (2021), https://www.acf.hhs.gov/sites/default/files/documents/cb/im2101.pdf [https://perma.cc/FS5T-USRG].[10] Relational permanence is particularly critical for Black, Indigenous, and other children of Color, who are disproportionately affected by the trauma of child welfare and other legal systems. *See generally* J. CHRISTOPHER GRAHAM, WASH. STATE DEP'T OF CHILDREN, YOUTH & FAMILIES, 2019 WASHINGTON STATE CHILD WELFARE RACIAL DISPARITY INDICES REPORT

---

[10] *See also* Jennifer Miller, *Creating a Kin-First Culture in Child Welfare*, 36 CHILD L. PRAC. 83, 83 (2017) ("Research confirms that children do best in kinship foster care and that family connections are critical to healthy child development and a sense of belonging. Kinship care also helps preserve children's cultural identity and relationship to their community." (footnote omitted)); Br. of Pet'r at 29-30 (citing numerous studies); Br. of WDA et al. Amici at 8-10 (citing numerous studies); Sixto Cancel, Guest Essay, *I Will Never Forget That I Could Have Lived with People Who Loved Me*, N.Y. TIMES, Sept. 16, 2021, https://www.nytimes.com/2021/09/16/opinion/foster-care-children-us.html.

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(2020) (hereinafter WASHINGTON CHILD WELFARE RACIAL DISPARITY), https://www.dcyf.wa.gov/sites/default/files/pdf/reports/CWRacialDisparityIndices 2019.pdf.

Yet, K.W. and amici correctly point out that the "best interests of the child" standard is susceptible to class- and race-based biases, and it is impermissible for the Department or dependency courts to rely on factors that serve as proxies for race in order to deny placements with bonded relatives. *Cf. In re Custody of Smith*, 137 Wn.2d 1, 20, 969 P.2d 21 (1998) (warning against interpreting the "best interests of the child" standard as permitting the State to "break up stable families and redistribute its infant population to provide each child with the 'best family'"), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). Decisions in child welfare proceedings "are often vulnerable to judgments based on cultural or class bias," given that poor families and families of Color are disproportionately impacted by child welfare proceedings. *Santosky v. Kramer*, 455 U.S. 745, 763, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion); *see also* Br. of Pet'r at 31 (citing studies); Br. of WDA et al. Amici at 3-4 ("The disparate separation of Black and Native American families [is] the result of a deeply engrained history of taking children of [C]olor from their parents in the name of furthering the child's 'best interests.'" (citing Leah A. Hill, *Loving Lessons: White Supremacy,* Loving v. Virginia*, and Disproportionality in the Child Welfare*

*System*, 86 FORDHAM L. REV. 2727, 2733 (2018))).  For example, in King County, the Black population is approximately 14 percent of the overall population but made up 36 percent of the dependency caseload in 2020.  DEPENDENT CHILDREN IN WASHINGTON STATE 2020 ANNUAL REPORT apps. B, C-71.

K.W. points to GR 37 for examples of criteria that have historically been used as proxies for race or ethnicity, such as prior contact with law enforcement or not being a native English speaker.  GR 37(h)(i), (vii).  Although GR 37 is not directly applicable to placement decisions in child welfare cases, Washington courts have previously condemned overreliance on similar factors in placement decisions that can serve as proxies for race and class, like criminal history and immigration status.  *E.g.*, *J.B.S.*, 123 Wn.2d at 12; *M.R.*, 166 Wn. App. at 505.  We know that like all human beings, judges and social workers hold biases, and we know that families of Color are disproportionately impacted by child welfare proceedings.  Therefore, actors in child welfare proceedings must be vigilant in preventing bias from interfering in their decision-making.  Factors that serve as proxies for race cannot be used to deny placement with relatives with whom the child has a relationship and is comfortable.  RCW 13.34.130(3).

Given the expressed statutory preference for relative placement, the empirically demonstrated value and importance of relational permanence, and the danger of improper biases about "best interests" contaminating the decision-making

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

process, courts must give *meaningful* preference to relative placement options.

Children are entitled to procedural fairness in the evaluation of potential placements.

Courts must do more than give a passing acknowledgment for relative preference,

as occurred in this case. Courts must actually treat relatives as preferred placement

options and cannot use factors that operate as proxies for race or class to deny

placement with a relative. RCW 13.34.130(3), (6).

      C.    Failure To Return K.W. to Relative Care

RCW 13.34.130(3) requires the court to consider the child's existing

relationships and attachments and to give preference to placement with relatives who

are "willing, appropriate, and available to care for the child" and "with whom the

child has a relationship and is comfortable." In the event that the child cannot be

maintained in "his or her home," the child must be placed with a "relative or other

suitable person." RCW 13.34.130(1)(a), (b)(i). The last resort, as contemplated by

the statute, is placement "with a person not related to the child." RCW 13.34.130(3).

Here, K.W. requested to be returned to relative care with either Aunt H. or

Grandma B., relatives with whom he had strong relationships and attachments, since

they had been involved in raising him since he was an infant. It is important to note

here that K.W. had been living with Grandma B. prior to his removal with no issues;

the reason for removal appears to have been the failure of Grandma B. to notify the

Department that she was taking a one-day trip and had arranged for someone else

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

K.W. knew to watch him until her return. K.W., the prospective relative caregivers, and numerous other members of the family attested to the bonds between K.W. and these relatives and to the safe environments they could provide him. Aunt H. and Grandma B. endeavored to answer every single one of the Department's concerns and made significant efforts to complete home studies and otherwise demonstrate that they were willing, appropriate, and available to care for K.W. It is difficult to imagine what more Aunt H. or Grandma B. could have done to demonstrate the strength of their familial bonds and their commitment to providing safe care for K.W. in their homes.

Aunt H. had previously been very involved in K.W.'s life and had expressed a desire to be a permanent placement for him. Nevertheless, the Department refused to even consider placing K.W. with her before completing a home study—despite a court order expressly authorizing placement with her. Instead, when the Department met with Aunt H., the social worker raised concerns about her prior involvement with the Department; Aunt H. responded to each concern by explaining that each incident had either been unfounded, caused her to make changes to make the home safer, or alerted her to a risk she would take steps to protect K.W. from. The Department did not explain why she remained an unsuitable relative placement for K.W., other than its apparent prediction that she was unlikely to pass a home study. Prior involvement with child welfare agencies, without more, can serve as a proxy

*In re Dependency of K.W.*
No. 99301-7

for race or class, given that families of Color are disproportionately impacted by the child welfare system.[11] *See* WASHINGTON CHILD WELFARE RACIAL DISPARITY, *supra*. The Department's reliance on Aunt H.'s prior interactions with the child welfare system as a reason to deny her placement after she addressed each specific concern was arbitrary and improper. *Cf. J.B.S.*, 123 Wn.2d at 12 (criminal history

---

[11] For example, under the Indian Child Welfare Act (ICWA)—the "gold standard" in child welfare policy—children in foster care or preadoptive placement "shall be placed in the least restrictive setting which most approximates a family" with highest preference to a member of the child's extended family, absent "good cause to the contrary." 25 U.S.C. § 1915(b); BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 39 (2016). A party seeking to deviate from this placement preference must state their reasons on the record and bears the burden of proving by clear and convincing evidence that there is good cause to depart from the placement preference. 25 C.F.R. § 23.132(a), (b). One reason a court may conclude that there is good cause to depart from the placement preference is the unavailability of a suitable placement, but "the standards for determining whether a placement is unavailable must conform to the prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties," and socioeconomic status may not be a basis to depart from the placement preference. 25 C.F.R. § 23.132(c)(5), (d). Notably, prior contact with the child welfare system, criminal history, and poverty are not good cause reasons to depart from the strong preference for placement with relatives under ICWA. Likewise, tribes located around Washington State prioritize placement with extended family or other members of the tribal community and rarely treat factors like prior child welfare proceedings or criminal history as disqualifying in determining out-of-home placements for children. *See, e.g.*, NISQUALLY TRIBAL CODE § 50.09.09; NOOKSACK LAWS & ORDINANCES § 15.09.100; JAMESTOWN S'KLALLAM TRIBE TRIBAL CODE § 33.01.09(J); PUYALLUP TRIBAL CODE § 7.04.840. *But see* TULALIP TRIBAL CODE § 4.05.110(4) (prohibiting placement with someone with a criminal conviction, but only for certain crimes identified as disqualifying crimes by the social services division charged by the Tulalip Tribe with the responsibility to protect the health and welfare of Tulalip families and their children (beda?chelh)).

32

cannot be a dispositive factor in placement decisions); *M.R.*, 166 Wn. App. at 505

(immigration status cannot be a dispositive factor in placement decisions).

Likewise, Grandma B. had been the relative whom K.W.'s mother asked to

care for K.W. when he was a year old and who had raised him until the age of six,

with the Department's repeated approval. This is in compliance with the statute,

which says, "Absent good cause, the department shall follow the wishes of the

natural parent regarding the placement of the child." RCW 13.34.130(2). Grandma

B. helped raise multiple children—both her own natural children and the children of

friends and family who needed help—and she had a professional background and

training in early childhood development and trauma-informed care. The Department

insisted that it removed K.W. from Grandma B.'s care due to safety concerns and

that it did not want to return K.W. to Grandma B. without further investigation.

However, it is unclear what, if anything, the Department did to investigate those

safety concerns—other than receive statements from Grandma B. and Aunt H.

addressing each of those concerns. Instead, the Department appeared to conclude

that Grandma B. was not a suitable placement because she had been the victim of

domestic violence a decade earlier and allowed her estranged husband to maintain a

relationship with their daughter. The Department insisted that it would not consider

placement with Grandma B. until she had completed a department-authorized home

study including her estranged husband, despite her statements that he had not lived

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

in her home since before she took K.W. into her home and that she was willing to get a divorce.[12] The Department also penalized Grandma B., Aunt H., and Mr. W. for being unable to commit to being permanent placements for K.W. earlier.[13]

Additionally, the Department overemphasized the importance of future permanence, failing to consider the significant stability K.W.'s long-term relative caregivers had provided him for almost his entire life and the dramatic instability the Department had introduced into K.W.'s life by removing him from Grandma B.'s care. The Department apparently opposed placement with relatives because it could not be certain they would ultimately become permanent placements for K.W. However, these rationales of "permanency" and "stability" crumble under the facts of this case, where the Department abruptly removed K.W. from a relative placement with no prior safety concerns without conducting sufficient inquiry into the plans for his care, subjected him to three different foster homes in a few weeks, prevented him

---

[12] The Department has now conceded that the trial court erred in rejecting Grandma B's private home study based on unspecified alleged inaccuracies, and it also concedes that it should not have refused to conduct its own home study with Grandma B. while Aunt H.'s was pending.

[13] Under Laws of 2021, ch. 211, § 9(5)(c)(iii)(B) and (D), "[u]ncertainty on the part of the relative . . . regarding potential adoption of the child" and "conditions of the relative['s] . . . home [that] are not sufficient to satisfy the requirements of a licensed foster home" are impermissible reasons to deny shelter care placement with a relative who had expressed interest in caring for the child and meets other statutory requirements.

*In re Dependency of K.W.*
No. 99301-7

from attending an important annual family and cultural event, and then refused to return him to the care of his relatives, despite his and his family's many requests.

We reverse. Statutory preferences to place dependent children with relatives are "suitable measures for the care and welfare of the child" consistent with the statutory scheme and continue to apply after a child becomes legally free. RCW 13.34.210, .130(3), (6). The purpose of these statutes is to ensure children are safe and in placements that are consistent, stable, and in homes with relatives. Disrupting a child's placement, as happened in this case, for reasons that appear to have virtually no grounds at all, creates chaos for the child. That chaos can be mitigated or alleviated by following the statutory scheme ensuring children should be placed with relatives. Courts *must* afford meaningful preference to placement with relatives. RCW 13.34.130(3).

In this case, the juvenile court applied the wrong standard, which is an abuse of discretion. *M.R.*, 166 Wn. App. at 517. The court failed to consider whether the relatives K.W. requested to be placed with were "willing, appropriate, and available to care for the child" and "with whom the child has a relationship and is comfortable." RCW 13.34.130(3); *see A.C.*, 74 Wn. App. at 279 (a dependency court abuses its discretion when it makes a placement decision without considering the appropriate factors). Further, the court overlooked the Department's role in causing instability to K.W.'s placement and giving inappropriate weight to factors

35

*In re Dependency of K.W.*
No. 99301-7

that serve as proxies for race. It was an abuse of discretion to deny K.W.'s request to return to placement with a long-term relative caregiver after the Department abruptly removed him and the relatives made remarkable efforts to assuage the Department's concerns.[14] The court also erred in concluding that "stability" refers only to future permanence as a stabilizing factor for a dependent child, particularly when the child has existing relationships with the relatives. RCW 13.34.130(3) (preference for placement with a relative "with whom the child has a relationship and is comfortable"); *cf. J.B.S.*, 123 Wn.2d at 11. Here, the Department and the court relied on impermissible factors and failed to give meaningful preference to the relative placements K.W. requested.

CONCLUSION

The legislature has expressed a strong preference for placement with relatives during child welfare proceedings, and those placements must be given meaningful preference throughout a dependency in order to effectuate the empirically demonstrated harm-reduction purposes of relational stability. Here, the trial court abused its discretion in denying K.W.'s request to be returned to the care of relatives with whom he had existing relationships and felt comfortable. RCW 13.34.130(3). The court also erred in accepting the Department's reasons for opposing relative

---

[14] The court notes here that relative placements need not be exceptionally qualified under the statute. Rather, they need to be able to provide a safe place for children and provide competent care for the child. RCW 13.34.130(1)(b)(ii), (10).

36

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

placements—which, without more, serve as proxies for race and class. Therefore,

we reverse and remand to the trial court for further proceedings consistent with this

decision.

 

 

_____
Montoya-Lewis, J.

WE CONCUR:

_____        _____
González, C.J.            Stephens, J.

_____        _____
Johnson, J.            Gordon McCloud, J.

_____        _____
Madsen, J.            Yu, J.

_____        _____
Owens, J.            Whitener, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.