**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>Z.A., S.M.A., and S.A.A.,<br><br>Minor Children. | No. 84122-0-I<br>(Consolidated with Nos.<br> 84123-8-I, 84124-6-I)<br><br>ORDER DENYING MOTION<br>FOR RECONSIDERATION,<br>WITHDRAWING OPINION,<br>AND SUBSTITUTING OPINION |

The Department of Children, Youth, and Families moved for reconsideration of the opinion filed on October 23, 2023. The appellant has responded. A majority of the panel has considered the motion pursuant to RAP 12.4 and has determined that the motion should be denied. But the panel has determined that the opinion should be withdrawn and a substitute opinion filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on October 23, 2023, is withdrawn; and it is further

ORDERED that a substitute opinion shall be filed.

FOR THE COURT:

_Coburn, J._

For the current opinion, go to https://www.lexisnexis.com/clientlawreports/.

FILED
12/26/2023
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>Z.A., S.M.A., and S.A.A.,<br><br>        Minor Children. | No. 84122-0-I<br>(Consolidated with Nos. 84123-8-I, 84124-6-I)<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — The Department of Children, Youth and Families (Department) asks us to hold that it need only prove by a preponderance of the evidence that parents are not "available" under RCW 13.34.130(6)(a) before a court orders their children placed out of the home following a finding of dependency. We reject the Department's misreading of In re Dependency of W.W.S., 14 Wn. App. 2d 342, 469 P.3d 1190 (2020), and hold that, under RCW 13.34.130(6)(a), the Department still has the burden to prove by clear, cogent, and convincing evidence that a parent's deficiency jeopardizes the child's rights to conditions of basic nurture, health, or safety in circumstances where an in-home placement would pose a manifest danger to the children. Because the juvenile court did not apply the correct legal standard in its disposition order for an out-of-home

Citations and pincites are based on the Westlaw online version of the cited material.

placement, we reverse that order and remand for further proceedings.

The father, M.A., also appeals the court's determination of dependency and the court-ordered services. He contends that the finding of dependency reflects cultural biases and rests on an impermissible basis. We agree with the father that some of the court's findings, such as finding the father was not "prioritizing the children over the mother" did not constitute a danger of substantial damage to the children's psychological or physical development. However, substantial evidence did support the court's other findings that the father minimized or failed to recognize signs of the mother's drug use and did not understand how the mother's severe and worsening mental health issues affected the children. Accordingly, the lack of insight as to how the mother's deficiencies could pose a danger to the psychological well-being of the children and the court's finding that the father would provide the mother unlimited access to the children supported the determination of dependency.

We also remand for the court to strike the domestic violence (DV) component to a psychological evaluation because the basis for that service is not supported in the record. We otherwise affirm the order of dependency and other ordered services.

FACTS

This case involves the dependency of three siblings. A year after their father, M.A., was detained by Immigration and Customs Enforcement (ICE) in Minnesota, the children's mother, D.J., moved them back to Washington state. The mother's admitted drug use and mental health issues led to this dependency action, but this appeal involves the dependency action as to the father, who returned to Washington to reunite his children and help the mother.

After receiving multiple intakes (child abuse or neglect reports) in the summer of 2021, the Department petitioned in August for dependency of Z.A. (then 10 years old), S.M.A. (then 7 years old), and S.A.A. (then 4 years old), because of their mother's struggles with drugs and "severe mental health issues."[1]  The Department reported that the mother had admitted using "Meth," that her "brain is hijacked," that she needed help, and that she knew because of the drugs and mental health she could not watch her children or parent them properly.  The children were placed into protective custody with the mother's sister, Yasmin Aden.

The Department alleged that the children were dependent under RCW 13.34.030(6)(b) because they were "abused or neglected as defined in chapter 26.44 RCW" or subsection (c) because they "ha[d] no parent, guardian or custodian capable of adequately caring for [the children], such that [they are] in circumstances which constitute a danger of substantial damage to [their] psychological or physical development."

At the time the petition was filed, M.A. was living in Minnesota, where the family had previously lived.  The mother, D.J., had moved the children back to Seattle around March 2019, about a year after ICE detained the father in Minnesota in March of 2018.  ICE later released the father from detention in 2019, but, according to the father, he was still on "probation" with the Department of Homeland Security and therefore unable to move to live with the family in Seattle at that time.

At the time of the shelter care hearing on August 19, 2021, where parties appeared by telephone, the father was living in sober support housing in Minnesota.

---

[1] The Department also petitioned for dependency of a fourth child, the oldest, who has a different biological father than the other three and whose dependency is not part of this appeal.

The father admitted having a history of problems with alcohol use, depression and anxiety. Though no one disputed that the father was the biological father of all three children, his name only appeared on the birth certificate of S.M.A. The court found that the children had "no parent, guardian, or legal custodian to provide supervision or care" and that the release of the children "would present a serious threat of substantial harm to the [children]; . . . (mother only)." The Department recommended the same services for both the mother and father: "random [urinalysis (UAs)], chemical dependency evaluations and follow recommendations, mental health assessment and follow recommendations, parenting assessment and follow recommendations and in-home services upon reunification." The court did not order the mother or father to participate in any of the recommended services. The court ordered the father to cooperate in establishing paternity within 30 days of entry of the order. The court noted that the

> [f]inding of shelter care is made without prejudice to [the father]. Father can bring a motion on shortened time regarding shelter care once father establishes paternity to all 3 children and can provide the Department proof that he can safely parent all 3 children himself or that his sister and their family can provide a safe environment in her home.[2]

The children remained placed with their aunt Aden. The mother was allowed supervised visits and the father allowed unsupervised visits. Aunt Aden was designated as an approved visit supervisor.

The Department amended the petitions in September 2021 adding information related to the father's criminal history between 2002 and 2018 in Washington and Minnesota. The Department also alleged that the father had been living in a halfway house for his mental health for three months and previously lived in a halfway house for

---

[2] The father did not appeal the shelter care order.

4

substance use for two years.  The Department alleged that the father was in town in June 2020 when the mother, who reportedly appeared under the influence, had attempted to drive away in a vehicle with her children in the car, and also that the mother had on another occasion taken the father's rental car without his permission and crashed it.

The court entered an order finding dependency as to the mother in October 2021 after the mother did not appear or file an answer.  The court found that the children would be at substantial risk of harm if they were placed in the care and control of the mother.  The court found the mother was observed to invite strangers to her home and use drugs in her home, and that she is reported to have severe mental health issues and to not supervise her children properly.

In November, the father, with the assistance of the Department, arrived in Seattle, and the parties entered an agreed order on November 29 extending shelter care.  If the father followed conditions in the order and engaged in services as set forth in the order, and if there were no new child safety concerns, the Department intended to dismiss the dependency petition on the new fact-finding date.  The conditions included "[p]romptly obtain[ing] safe housing for the children and himself that passes a Department walk-through."  The order provided that "[o]nce the father obtains suitable housing, and provides documentation to show that he has been swabbed and DNA paternity is pending as to the 2 children, the children shall be placed in the father's care."  Other conditions in the order related to requirements that would apply once the children were placed with the father, such as the father not supervising the mother's visitation with the children, but would work to make the children available for court-

ordered visitation with their mother.  The only services mentioned were the Department agreeing to pay the father's first month's rent in order to facilitate the children's return home, and Family Preservation Services.  The father also agreed to continue to work diligently to establish legal paternity as to S.A.A. and Z.A., and to make efforts to obtain a protective parenting plan, if possible, though the last provision "shall not be interpreted to prevent dismissal if a parenting plan has not yet been obtained by the fact-finding date."  Nothing in the order required the father to submit to UAs or complete any type of evaluation or assessment.  The fact-finding hearing was continued to January 28, 2022.

The same day the extended shelter care order was entered, the father, through his counsel, had asked the assigned Department social worker at the time, Diana Wairimu, for help with housing because he had located two emergency shelters, but one would not allow children and he was not eligible for the other.  Unbeknownst to the father or his counsel, Wairimu was no longer with the Department when social worker Amanda Subcleff took over the case around November 30.

The father established biological paternity as to S.A.A. and Z.A. on December 2 and provided proof to the Department the next day in an email from father's counsel.  The email, sent to counsel representing the Department, Wairimu, and Department supervisor Amy Holmes, asked for assistance in next steps to establish legal paternity and also asked for help finding housing:

> [The father] could also use assistance with finding housing where the kids can come live with him.  We thought we had a sober living facility worked out, but once it got to the higher levels for approval, having 3 kids there was vetoed.  [The father] cannot get onto a family shelter waiting list until he has a document from DCYF saying that his children are in his care, creating a catch-22. He was working with Diana on this issue, but I believe she is out of office for a while now.  Who should his contact at DCYF be for this issue?

Subcleff received the December 3 email asking for help and the Department counsel's response to that email with an attached form for Subcleff to fill out to help the father establish legal paternity. Subcleff testified at trial that she could not recall if she ever filled out the form. She received another email requesting housing assistance for the father on December 7, but could not recall when she first reached out to the father about housing, though she believes it was within the first month of receiving the case. Subcleff first introduced herself and contacted the father by sending him a text on December 13 asking him to complete a UA that day and future random tests despite knowing that the extended shelter care order did not require UAs. Later at trial, Subcleff explained that "I had received report that there is history of substance use. And I had also received information that he had been sober. And due to having unsupervised visits, it would be best practice and good for his case to prove that sobriety."

The father did not complete any Department-requested UAs. Relatives reported the father was drinking alcohol and not visiting his children.

By January 28, 2022, the case was again headed for trial. The Department filed a motion to modify the shelter care order because of the change of circumstances of the father's alleged current use of alcohol. The court (noting that the upcoming dependency trial would address the issue of visitation and placement) denied the Department's request to order the father to complete weekly random UAs for 60 days as a condition of resuming unsupervised visitation. The court ordered that the father's in-person visitation shall remain unsupervised (as long as the mother was not present) twice a week for two hours per visit and may be expanded by the aunt or maternal uncle Abdinasir Osman. The court ordered that the person dropping off or picking up the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

children, anticipated to be the aunt or uncle, shall ensure that the father is not under the influence. The conditional requirements to return the children to the father remained as previously ordered.

In February of 2022 the case transferred from Subcleff to social worker Elizabeth Cervantes. When the father told Cervantes he was attempting to locate housing, she made a referral for an emergency housing voucher under the Family Unification Program. The father was selected for the voucher housing program. Cervantes supervised an in-person visit with both parents and the children in late February.

Cervantes filed a second amended petition in March 2022. The Department added allegations that the father had been previously charged with various domestic violence crimes including battery and disorderly conduct and that the father pleaded guilty to disorderly conduct domestic violence in 2016. The Department also alleged that the father was reportedly living with the mother, misusing alcohol, and refusing to submit to a UA. The Department also stated that the father reported living with a friend in an apartment and "wanted to have visitation with his children at their shared apartment, but did not agree with Department policy" that the friend should have to have a background check for the children to visit the father there. The Department alleged that the father "insisted only reunifying with the children if the mother would also be in the home and only visiting if the mother is present." The Department alleged that the father said he would keep the children safe but did not address how he would keep the mother's substance use and mental health from making the children unsafe if they were living with the mother.

After an eight-day trial was held in the end of March, the court found the children

dependent.[3]  The court reserved ordering services pending the dispositional hearing.

At the later disposition hearing, the court ordered the following services:  random UAs; drug/alcohol evaluation and compliance with any treatment recommendations if the UAs are missed, positive or diluted; psychological evaluation with parenting and domestic violence (DV) components and compliance with any treatment recommendation evidence-based in-home service upon reunification, and establish legal paternity.

The father appeals the dependency and disposition orders.  The Washington State Office of Public Defense, Washington Defender Association, and King County Department of Public Defense jointly filed a brief as amici curiae.

DISCUSSION

Dependency Determination

The court determined that all three children were dependent as defined in RCW 13.34.030(6)(c), in that the children "ha[ve] no parent, guardian, or custodian capable of adequately caring for the child[ren], such that the child[ren] [are] in circumstances which constitute a danger of substantial damage to the child[ren]'s psychological or physical development."  The father challenges the sufficiency of the evidence supporting the finding of dependency.

The State has the burden to prove dependency by a preponderance of the evidence.  In re Dependency of M.P., 76 Wn. App. 87, 90, 882 P.2d 1180 (1994) (citing RCW 13.34.130)).  In evaluating a claim of insufficient evidence of dependency, this court determines whether substantial evidence supports the court's findings of fact and

---

[3] The judge acknowledged this was her first dependency trial and explained "I've had a-a variety of termination[s] . . . but I've never been this early in the process to be honest."

9

whether the findings support the conclusions of law.  Id.  In a dependency proceeding,

evidence is substantial if, when viewed in the light most favorable to the party prevailing

below, it is such that a rational trier of fact could find the fact in question by a

preponderance of the evidence.  M.P., 76 Wn. App. at 90-91.  We "defer to the trier of

fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness

of the evidence."  State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004),

abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct.

1354, 158 L. Ed. 2d 177 (2004).

*A. Father's Challenges to Dependency Findings*

The father's opening brief challenges factual findings from the dependency order.

The court made 22 separate findings in its dependency order.  As a preliminary matter,

the Department contends the father waived any challenge to the court's findings

because he summarily assigned error to "Finding of Fact 2.2" but did not differentiate

among the 22 separate findings within that section.  The Department argues that the

father thus failed to comply with RAP 10.3(a)(4), which requires a "separate concise

statement of each error a party contends was made by the trial court, together with the

issues pertaining to the assignments of error."  However, an appellate court may in its

discretion review findings to which the appellant fails to properly assign error "as long as

the appellant has identified those findings and the nature of his challenges to them

elsewhere in the brief."  Bircumshaw v. State, 194 Wn. App. 176, 199, 380 P.3d 524

(2016).  This court is to interpret its rules liberally "to promote justice and facilitate the

decision of cases on the merits."  RAP 1.2(a).

We therefore address identifiable challenged findings to which the father

presented argument in his opening brief.

*(i) Finding of Fact 15(f)*

The father contends that "[a]lthough there was not a single piece of evidence presented that [the mother] was using drugs between 2017 to 2018, the court's findings fault [the father] for not knowing about [the mother's] drug use in late 2017 to 2018." This sufficiently challenges finding of fact 15(f): "[the father] should have known about the mother's drug use in late 2017- early 2018 when she was leaving the home a lot and gone for long periods of time."

At the end of 2017 the family moved to Minneapolis from Wisconsin. At that time the mother and father lived together. Multiple witnesses testified as to when they first noticed a problem with the mother, but none of it concerned the use of drugs at the end of 2017 and early 2018.

The father's sister, Suudi Mohamed, lives in Minneapolis and is a mental health practitioner. In 2017 when the family was living in Minneapolis, she saw the family every two weeks. She saw the father cook and care for the kids, take them to the park and insist that the kids in school do their homework. She described him as a "great father" and that the kids were happy with him. Mohamed testified that she thinks it was around the end of 2017 or January 2018 that she began observing the mother disappearing "[f]our or five, six times, seven . . . a lot of times," overnight, leaving the father to watch the children alone. She suspected the mother was out gambling, but otherwise did not know what was going on. When ICE detained the father in February or March of 2018, the mother would leave the children with either their maternal grandmother or the grandmother would stay with them, or the children would stay with

Mohamed or with her older sister.  During this time, Mohamed had the opportunity to observe the mother with her kids and stated that she was just a normal mother, and that Mohamed did not have any concerns when the children were in the mother's care. While in ICE detention, the father would call Mohamed daily and ask about his family and to speak with his kids when they were present.  He was concerned about the mother leaving the kids with Mohamed or the grandmother.

In 2019 the mother moved back to Seattle with the children.  When the father was released from ICE detention he was working with his lawyers to get him documents so he could move to Seattle and get the kids because he could not leave Minnesota right away.  It was after the mother moved to Seattle that Mohamed sensed the mother was having mental health concerns or perhaps involved with drugs.  Mohamed recalled the mother calling crying, scared and saying she hides under the bed because she sees things.  Mohamed said she would ask the mother's brother to get her help and into treatment.

Aden testified that she recalled the father calling one time some time "before COVID" to report the mother had left the children alone and could not be found and asked for their help.  The mother's sister and brother spoke directly to police in Burien and called a Minneapolis police department during the family's search, though the mother turned up of her own volition a week later.  Aden testified that she did not know that the mother was abusing drugs while living in Minneapolis.  Aden would call the mother and find the children "all home alone."  She then bought a train ticket for the mother and children to return to Seattle.  Aden testified that the mother "promised she

will get better, and then we find out she was [using] more than alcohol." The mother got

treatment for her substance use but then relapsed.[4]

Osman testified that he did not know if the mother, while in Minneapolis, was

using drugs or alcohol, he just knew she was always asking for money and heard that

the kids were left alone. He and the maternal aunt coordinated to send the tickets for

her and the children to return to Seattle. After the mother returned and disappeared for

several weeks leaving the children in the aunt and uncle's care, Osman sat her down to

find out what the issue was and found out only then that the mother was using drugs.

The father testified that in 2018 before he was detained by ICE, he was

physically separated from the mother because of his drinking habit, but he was still co-

parenting and cooking for the children. When the father got out of ICE detention in late

2019 the mother was already in Seattle. The mother asked the father to wire money

every week. The father suspected that "she wanted it for gambling." One of the

mother's neighbors and close friends in Washington, who had seen the family often

before their move to Minnesota, only noticed significant negative changes in the

mother's mental state after her return to Seattle with the children.

The testimony from the fact-finding hearing showed that mother started

disappearing about the end of 2017 or January 2018. Though there is evidence that the

mother had disappeared at times in early 2018 before the father was detained by ICE,

---

[4] The mother signed a voluntary placement agreement with the Department in June 2020, engaged in voluntary services, and showed signs of stability by completing two months of random UAs, completing an assessment, Homebuilders and nearly finishing a Positive Parenting Program. The case was closed, but the mother relapsed and failed to engage with any services 26 days later. Because the mother did not appear or file an answer in response to the petition of dependency as to her, the court found that the Department's "[a]mended petition (minus parts about [the Father]) is deemed admitted."

both the father and his sister suspected the mother was gambling. The mother's own sister and brother knew there was a problem but did not know what the problem was until after the mother returned to Seattle in 2019. It was only then that they realized she was using drugs. Substantial evidence does not support finding of fact 15(f) that the father "should have known about the mother's drug use in late 2017- early 2018 when she was leaving the home a lot and gone for long periods of time."

*(ii) Findings of Fact 4(d) and 12*

The father also contends in his opening brief that "[r]ather than actual evidence, the court instead relied on the 'impressions' of the social workers and the guardian ad litem (GAL), Pauline Duke for its conclusion that [the father] cannot be a protective force for his children because he wanted to reunite with his wife and lacked insight into the causes of her erratic behavior." This relates to finding of fact 4(d): "[The father's] testimony that he did not know about the mother's problems is of concern showing a lack of credibility and insight." It also relates to part of finding of fact 12: "The Court has concerns about [the father's] ability to protect the children from mother's erratic behavior."

A trial court may appoint a GAL to make recommendations to the court about appropriate parenting arrangements. Fernando v. Nieswandt, 87 Wn. App. 103, 107, 940 P.2d 1380 (1997) (citing RCW 26.09.220; RCW 26.12.175)). "In effect, she acts as a neutral advisor to the court and, in this sense, is an expert in the status and dynamics of that family who can offer a common sense impression to the court." Id.

The testimonies of Duke and Cervantes relevant to these challenged findings included impressions based on their observations and/or interactions with the father.

84122-0-I/15

The father fails to cite to any authority to support a contention that such testimony would not be considered "actual" evidence. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." State v. Logan, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000) (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

When Cervantes first spoke to the father in February she tried to gather insight as to whether the father understood that the biggest safety threat leading to the children's removal was the mother's mental health and substance use. Cervantes testified that the father responded by saying that his wife is "just misunderstood and that she is a very good woman; you know, that she is a good mother . . . and that she does need help." Cervantes clarified that "it felt like he was dismissive and not fully understanding the safety threats and concerns that she posed to her children."

Duke sat in on a permanency planning meeting attended by Cervantes, the father, and other relatives where the topic of Z.A.'s mental health was raised. Previously during the 2020-21 school year Z.A. had used a school electronic device to search about the topic of suicide. The school tried to call the mother, made a report to Child Protective Services (CPS), and also reached out to Aden. Aden testified that she asked for therapy for Z.A. who the aunt described as "worr[ying] a lot" and being unwilling to discuss problems she was having. When the topic of Z.A.'s mental health was brought up at the permanency planning meeting, the father, according to Cervantes, became upset that it was brought up by relatives and stated that it was disrespectful and that family should help each other and not rely on the government.

15

The father did not offer ideas of how to help Z.A. and did not ask if the Department had plans to help Z.A or if Z.A. had engaged in mental health counseling. Cervantes testified that the father's responses were very dismissive of the concerns that relatives and the Department had for Z.A. Duke testified that she was concerned about Z.A.'s well-being as well as that of the two younger children who were not able to articulate like Z.A. but who all have witnessed what is going on with their mother.

The father testified at trial that he first learned about the suicide research incident from his attorney about eight months prior and that nobody from CPS or the school had called him when it happened. When asked during trial if he was comfortable talking about either his mental health or the mental health of his children, he answered

> Yeah. Absolutely, yeah. I mean, I–I talk to my kids, you know, about–you know, I like to minimize it, what I'm saying, but I like to just–I talk to them, and I prepare them for the future, you know, what to expect in life. So, sometimes, yeah, I–I make sure they open up to me about everything, you know, and–

When asked to explain what he meant by talking to them about it and preparing for the future and to provide an example, the father said he tells his kids they have to think before they do things no matter how big or small because what they do has consequences. The father said this is what his father told him so he makes sure to tell his children the same.

The juvenile court found all collateral witnesses credible, including Cervantes and Duke. The testimony from Duke and Cervantes that support these challenged findings of fact is based on observations and interactions with the father and was proper evidence considered by the court. This court is not to weigh the evidence or the credibility of witnesses. M.P., 76 Wn. App. at 91 (citing In re Welfare of Sego, 82 Wn.2d

16

736, 739-40, 513 P.2d 831 (1973) ("The trial court has the witnesses before it and is able to observe them and their demeanor upon the witness stand. It is more capable of resolving questions touching upon both weight and credibility than we are.")).

The court found that many witnesses, including the father, testified that the mother's mental health issues have worsened. She suffers delusions, often talks to herself, and makes illogical statements. It follows that if the father lacked insight as to how the mother's deficiencies could pose a danger to the psychological well-being of the children, then that raises concerns as to whether the father could protect the children from the mother's erratic behavior. Substantial evidence supports finding of fact 4(d) and 12.

*(iii) Finding of Fact 8*

The father wrote in his opening brief that "[d]espite [the father's] insistence that he would ensure the children were safe, even if it meant limiting and supervising their contact with their mother, the Court concluded that [the father] would allow [the mother] to have unlimited access to the children." This relates to finding of fact 8: "The Court finds that [the father] would allow the mother unlimited access to the children." At trial the father testified that he understood the importance of the mother not having unmonitored visitation with the children based on her pattern of erratic behavior and drug abuse. Whether to believe the father's testimony is a credibility determination by the trier of fact that this court does not revisit.

The remaining unchallenged findings by the court are verities. In re Dependency of A.E.T.H., 9 Wn. App. 2d 502, 517-18, 446 P.3d 667 (2019).

17

84122-0-I/18

*B. Finding of Dependency*

We affirm the trial court's order of dependency because the court's unchallenged findings support its conclusion. In order for a juvenile court to declare a child dependent, the court must find by a preponderance of the evidence that the child meets one of the statutory definitions of dependency. In re Welfare of Key, 119 Wn.2d 600, 612, 836 P.2d 200 (1992). A "dependent child" under the operative subsection argued by the Department is one who "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c). At dependency proceedings, the fundamental liberty interest of parents must be balanced against the State's interest in protecting the physical, mental, and emotional health of children. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). A finding of dependency under RCW 13.34.030(6)(c) "does not require proof of actual harm, only a 'danger' of harm." Id. at 951; see also In re Welfare of Frederiksen, 25 Wn. App. 726, 733, 610 P.2d 371 (1979) ("Nothing in the statute suggests that the Department . . . must stay its hand until actual damage to the endangered child has resulted.").

The trial court found that the father has at multiple times minimized or failed to recognize signs of the mother's drug use despite having abundant notice of those issues. The father testified that he did not know until 7-8 months ago that the mother was using substances, but the court did not find that credible. The "[m]other was arrested in June 2020, CPS was involved [and a social worker] explained to [the father] the Department's safety concerns that included drug use and he appeared to

18

understand."[5] The father was also aware that the mother was arrested in August 2020 on a DUI. Aden and Osman both expressed concerns of drug use to the father. Yet, in September 2020, when the father was able to come to Seattle for a visit, the mother got in the driver's seat of the father's rental car against his wishes, drove through a red light and got in an accident with the father in the passenger seat. Aden testified that both the mother and father had admitted they had been drinking. The father denied that he had been drinking and testified that he had been taken to the hospital and provided a blood test and "it was good." When asked if the father believed the mother was under the influence at the time, the father said he thought the mother was just quiet the whole time and mad at him.

The court also found that the mother's mental health issues have worsened, causing her to suffer from delusions, talk to herself, and make illogical statements. Aden had to call police when the mother banged on her door. The court found the father's testimony that he did not know about the mother's problems is "of concern showing a lack of credibility and insight." The court found that the father would allow the mother unlimited access to the children because "he wants to reunite immediately with the mother." Osman testified that he saw the father drinking and smelled alcohol on his breath since he returned to Seattle. The court found it concerning that the father "does not understand how mother's behavior affects the children." The court found that "[c]urrently there are insufficient protective factors for children to be safe in [the father's] care. The circumstances that would cause substantial damage to children's psychological well-being is the mother, which is why [the father] needs to be a

---

[5] The record reflects that the father was not in Washington at the time of the June 2020 incident, as the Department had alleged in its second amended petition.

19

protective force."

On the basis of these uncontroverted findings, we affirm the juvenile court's conclusion that the children are dependent as to the father. However, because the court makes other findings that do not support that the children are dependent, but do relate to the father's concern of cultural biases, we address that argument as well.

*C. Cultural and Racial Bias in Dependency Proceedings*

The father alleges that the finding of dependency reflects cultural biases and rests on an impermissible basis. He contends that the court reached the conclusion that the father could not be a strong enough protective force by "relying on the father's commitment to support the children's mother, refusing to abandon or disparage her—consistent with his Somali-Muslim cultural traditions and religious beliefs."

The Department and the trial court took issue with the father for not "prioritizing the children over the mother." The court did consider the lack of in-person visits with the children and the amount of time the father spent with the mother. The court found that the father was not credible in claiming he had in-person visits with the children at their daycare. The court also found that the father "has been with the mother in Seattle since November 2021 daily or very frequently yet visits with the children have been inconsistent."

The father admittedly testified that he stops by the mother's home before and after work to help her cook and clean because she has no one to help her. His testimony that he saw the children at their daycare was contradicted by testimony of the daycare owner. He also testified that he tried to set up appointments with Aden but she would not let him see the children, causing him to give up and rely on Zoom for visits.

Aden testified that the father never called to schedule a visit with the kids, while at the same time conceding that she had blocked the father's phone number the entire time since he was in Minneapolis and had forgotten she blocked him. She also testified that it was not part of her job to reach out to the father to arrange visits and that the father could have called Osman's phone if the father wanted to see the kids.

When asked if she had an opinion as to whether the father understood what was required to be a fulltime parent, Cervantes noted that it did not appear so but that there could be "cultural pieces" to that. As an example, Cervantes explained that when she offered family visits, the father stated to her that "he did not want to visit with the children by himself, that that would be a shame and embarrassment if he were to visit them without the mother."

Cervantes testified at the fact-finding hearing that the father had not missed any visits with his children since she was assigned to the case, but that his new job did not allow visits most day times on weekdays. The court found that there had "been too much caseworker turnover in this case, and that has made things difficult."

Despite concerns about the frequency and manner of the father's visits with the children, nothing in the record showed that the children were not bonded to the father. Both Cervantes and Osman testified that at recent in-person visits, the children were happy and interacting normally with the father. Cervantes had supervised an in-person visit at the mother's home with both the mother and father. The children "appeared very excited and ran up the stairs and into the home. Lots of hugs to both parents. It was very clear that they were happy to see them." Three days prior to this, Cervantes first had contact with the mother at the walk-through at the mother's home. Cervantes was

able to make contact with the mother because of the father's efforts. During the walk-through the father tried to support Cervantes by reminding the mother that she did well the last time she received services.

It appears that the father helped the Department facilitate a visit between the mother and children. Nothing prohibited the family visits. The only requirement when the mother was present was that it was supervised by either the Department or Aden, the Department's designee. When Cervantes was asked at trial, "What, if any, evidence have you seen to indicate that [the father's] efforts to get [the mother] some help is at the expense of his children?" Cervantes answered,

> So, one of the behavioral capacities–I'm sorry, behavioral protective capacities that we look at are the actions that a parent is taking to mitigate any safety concerns. And what I was testifying was that his actions, through conversations with myself, have continuously been emphasizing the welfare of [the mother]. So, I wasn't testifying that was–I was testifying that–yeah, that his focus was the welfare of [the mother] and the reunification of the children with [the mother], where we would like to see a parent's cognitive and behavioral protective capacities being able to articulate a safety plan for the children, being able to identify the needs of the children. And he has very much been in alignment with the mother's welfare versus the children's welfare.

In terms of the determination of dependency, the record does not reflect that the father's efforts at helping the mother was at the expense of the children to the point it constituted a danger of substantial damage to the child's psychological or physical development.

It is the duty of courts to bear in mind that "[d]ecisions in child welfare proceedings 'are often vulnerable to judgments based on cultural or class bias,' given that poor families and families of Color are disproportionately impacted by child welfare proceedings." In re Dependency of K.W., 199 Wn.2d 131, 155, 504 P.3d 207 (2022)

(quoting Santosky v. Kramer, 455 U.S. 745, 763, 102 S. Ct. 1388, L. Ed. 2d 599 (1982)).  This court takes notice of the overrepresentation of King County's Black population (14 percent) relative to its percentage of the child dependency caseload (36 percent).  K.W., 199 Wn.2d at 156 (citing WASH. STATE CTR. FOR COURT RSCH., DEPENDENT CHILDREN IN WASHINGTON STATE: CASE TIMELINES AND OUTCOMES 2020 REPORT apps. B, C-71 (2021), https://www.courts.wa.gov/subsite/wsccr/docs /2020DTR.pdf [https://perma.cc/PZ6Z-52ZP].

"Washington courts have previously condemned overreliance on similar factors in placement decisions that can serve as proxies for race and class, like criminal history and immigration status."  Id.  (noting that GR 37, which addresses implicit bias in jury selection, is "not directly applicable to placement decisions in child welfare cases," but nonetheless provides useful "examples of criteria that have historically been used as proxies for race or ethnicity" and that "actors in child welfare proceedings must be vigilant in preventing bias from interfering in their decision-making.").[6]

The Department conceded that there may have been a cultural component at play in the father's response to the dependency.  Cervantes described, as an example, how the father stated to her that "he did not want to visit with the children by himself,

---

[6]  The recent passage of H.B. 1227, the Keeping Families Together Act, includes a statement of Legislative intent that addresses the continuing disproportionate removal of Black and Indigenous children from their families despite reform efforts.  LAWS OF 2021, CH. 211.  The Act changes the evidentiary standard for removal of a child following a shelter care hearing order under RCW 13.34.065, which has been amended to specify that "[t]he existence of community or family poverty, isolation, single parenthood, age of the parent, crowded or inadequate housing, substance abuse, prenatal drug or alcohol exposure, mental illness, disability or special needs of the parent or child, or nonconforming social behavior does not by itself constitute imminent physical harm."  RCW 13.34.065(5)(a)(ii)(B).  See In re Dependency of L.C.S., 200 Wn.2d 91, 101-02, 514 P.3d 644 (2022) (discussing legislative intent behind H.B. 1227 as it relates to a removal decision which placed a child, who had suffered injuries in mother's care, with godparents in preference to a father).  The relevant portion of the amended statute went into effect July 1, 2023, after the shelter care hearing in the instant case.

that that would be a shame and embarrassment if he were to visit them without the mother." This is a far cry from the Department's allegation in its amended petition that the father "insisted only reunifying with the children if the mother would also be in the home and only visiting if the mother is present." The Department did not prove that allegation at trial.

Nothing prohibited the Department from arranging family visits that included the entire family, as long as it was supervised because of the mother's presence. In fact, despite the father's previous requests and offer to help facilitate between the mother and the Department that was rejected by Subcleff, when Cervantes was assigned to the case, she, in fact, was able to arrange a family visit that included the mother, with the assistance of the father.

We conclude that the trial court's findings relating to the father needing to prioritize the children *over* the mother suggests an either-or scenario that contradicts the purpose of dependency. "The primary purpose of a dependency is to allow courts to order remedial measures to preserve and mend family ties." In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005). The record does not establish how the father's desire to include the mother in permitted supervised family visits was a circumstance that constituted a danger of substantial damage to the children's psychological or physical development.

### Order of Disposition

A placement decision in a dependency proceeding is discretionary and will be overturned on appeal only upon a showing of abuse of discretion. In re Dependency of R.W., 143 Wn. App. 219, 177 P.3d 186 (2008). A juvenile court abuses its discretion

when its decision is based on untenable grounds or untenable reasons. In re Welfare of R.S.G., 172 Wn. App. 230, 243, 289 P.3d 708 (2012). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

After a court finds a child dependent by a preponderance of the evidence, the juvenile court may, "after consideration of the social study prepared pursuant to RCW 13.34.110" and a disposition hearing, order either that the child remain in the home or be placed outside of the home with a relative or other suitable person. RCW 13.34.130. RCW 13.34.130(6) provides three bases to support an out of home placement.

> An order for out-of-home placement may be made only if the court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, specifying the services, including housing assistance, that have been provided to the child and the child's parent, guardian, or legal custodian, and that prevention services have been offered or provided and have failed to prevent the need for out-of-home placement, unless the health, safety, and welfare of the child cannot be protected adequately in the home, and that:
>
> (a) There is no parent or guardian available to care for such child;
>
> (b) The parent, guardian, or legal custodian is not willing to take custody of the child; or
>
> (c) The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

RCW 13.34.130(6). The juvenile court ordered the children remain with Aden based on

a finding that "there is no parent or guardian available to care for such child[ren]."  This language follows the language of RCW 13.34.130(6)(a).

The Department urges us to apply a "preponderance of the evidence" standard when out-of-home placement is based on either RCW 13.34.130(6)(a) or (b).  The Department ignores well settled law by proposing that this court apply the same standard when determining whether children should be placed out of their parent's home during a dependency as we do when determining whether a child is dependent.  We decline the Department's invitation, and instead will continue to "plac[e] the burden upon the Department to show good cause by *clear and convincing* evidence why it should not follow the wishes of the natural parent regarding placement of the child [which] *provides additional safeguards of the parent's right*."  Key, 119 Wn.2d at 611 (emphasis added); see also In re Welfare of Aschauer, 93 Wn.2d 689, 697-98, 611 P.2d 1245 (1980) ("We have repeatedly said that the welfare of the child is the goal of a dependency hearing and we have required that proof be made by evidence that is clear, cogent and convincing.")); Sego, 82 Wn.2d at 739 ("A synthesis of our cases, as well as some from other jurisdictions convinces us of the logic that clear, cogent and convincing evidence is necessary to sustain an order permanently depriving a parent of the care, custody and control of his children.").

The Department relies on this court's recent holding in W.W.S., but nowhere in W.W.S. did this court suggest a lower standard of proof to determine whether a child should be placed out of the home.[7]  The holding in W.W.S. hinged on a statutory

---

[7] The Department also cites to Schermer and In re Dependency of Chubb, 112 Wn.2d 719, 727-29, 773 P.2d 851 (1989).  Neither supports the Department's proposition.  Schermer discussed the standard of proof in determining dependency and did not involve an out-of-home placement.  161 Wn.2d at 942.  Chubb involved a continued dependency and termination and

26

interpretation of the term "available" in former RCW 13.34.130(5)(a) (2018)
(renumbered as RCW 13.34.130(6)(a)). 14 Wn. App. 2d at 357. The question of
whether a different standard of proof applied was not an issue raised or addressed in
that case. "In cases where a legal theory is not discussed in the opinion, that case is
not controlling on a future case where the legal theory is properly raised [and so that
prior case] is not dispositive of the issue before the court." Berschauer/Phillips Constr.
Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 824-25, 881 P.2d 986 (1994) (citation
omitted)). see also In re Pers. Restraint of Swagerty, 186 Wn.2d 801, 809 n.1, 383 P.3d
454 (2016) ("Questions which merely lurk in the record, neither brought to the attention
of the court nor ruled upon, are not to be considered as having been so decided as to
constitute precedents.") (quoting Webster v. Fall, 266 U.S. 507, 511, 45 S. Ct. 148, 69
L. Ed. 411 (1925)).

The father, joined by amicus curiae, in arguing that an out-of-home placement
can only be affirmed under subsection (c) of RCW 13.34.130(6), repeats the same
arguments raised in W.W.S. In W.W.S. this court considered and rejected appellant's
argument "that reading 'available' to mean more than physical availability would
'render[] meaningless [former RCW 13.34.130(5)(c)], which considers whether clear and
convincing evidence shows a manifest danger of abuse or neglect in placing the child
with the parent.'" 14 Wn. App. 2d at 359-60 (alterations in original). We recognized that

> there may be circumstances where a parent is "available" in that she has
> the ability to provide for a child's basic nurture, physical and mental health,
> and safety, but where an in-home placement would nonetheless pose a
> *manifest danger to the child* for *other reasons*, such as the presence of an
> abuser or environmental dangers in or around the parent's home.

addressed balancing the interest in children's welfare with the personal rights of parents. 112
Wn.2d at 729. The standard of proof to support an out-of-home placement was not at issue in
Chubb.

27

W.W.S., 14 Wn. App. 2d at 360 (emphasis added).  We held "that under the plain language of former RCW 13.34.130(5)(a), a parent is not 'available' if she has deficiencies that jeopardize the child's rights of basic nurture, physical and mental health, and safety" in a circumstance where an in-home placement would "pose a manifest danger to the child" for reasons that may not necessarily be considered abuse or neglect under subsection (c).  W.W.S., 14 Wn. App. 2d at 359-60.  We observed that "the legislature expressly declared that 'the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized.' " Id. at 361 (quoting RCW 13.34.020).  Thus, the Department has the burden to prove, by clear, cogent, and convincing evidence that the father's deficiencies jeopardizes the children's rights to conditions of basic nurture, health, or safety in a circumstance where an in-home placement would pose a manifest danger to the children.

The trial court made no such finding.  The court merely agreed with the Department's recommendation that the children should be placed out of the home and remain with the maternal aunt:

> Pursuant to RCW 13.34.136(a)[8]  [the father] is not available *because he is simply not prepared to be the sole caretaker.*  The Court has concerns regarding substance abuse, mental health and familial violence.  Moreover, he needs to learn some basic child development to be prepared to be a sole parent.  He has never served in that role and it was apparent by his testimony.

(Emphasis added.)  The trial court also declared that it found "good cause to place children with relatives at this point."[9]  However, as we held in W.W.S., RCW

---

[8] It appears the court's citation to "RCW 13.34.136(a)" was a scrivener's error.  That statute does not exist.  The applicable statute is RCW 13.34.130(6)(a).

[9] The court does not reference RCW 13.34.130(2), which states "Absent good cause, the department shall follow the wishes of the natural parent regarding the placement of the child in

13.34.130(6) "authorize[s] out-of-home placement only when reasonable efforts have been made to prevent removal. *Once that threshold has been met*, placement decisions are based on the child's best interests." 14 Wn. App. 2d at 361 (emphasis added). See In re Dependency of A.C., 74 Wn. App. 271, 279, 873 P.2d 535 (1994) (holding that trial court erred by failing to give paramount consideration to the child's best interests in making placement decision).

Here, the trial court did not find by "clear, cogent and convincing evidence" that the father's deficiencies were such that an in-home placement posed a manifest danger that jeopardized the children's rights of basic nurture, physical and mental health, and safety. Instead, the court found that it would be "detrimental to the children to move them into a hotel with their father at this time" because he has "not shown any type of consistency in their lives" and "does not possess the skills to care for them as the sole parent and he has not articulated a realistic plan to do so." The court found that it is "imperative to consider the best interest of the children and not have them going back and forth between housing."

We conclude that the trial court abused its discretion because it applied the incorrect legal standard and failed to determine whether the Department had met its burden to show by clear, cogent, and convincing evidence of a circumstance where an in-home placement would "pose a manifest danger" to the children. Accordingly, we reverse the trial court's placement decision in the disposition order and remand for the

---

accordance with RCW 13.34.260." RCW 13.34.260 provides that "[p]references such as family constellation, sibling relationships, ethnicity, and religion shall be considered when matching children to foster homes. Parental authority is appropriate in areas that are not connected with the abuse or neglect that resulted in the dependency and shall be integrated through the foster care team."

29

court to apply the correct legal standard. This holding does not preclude the court from considering current information at a new disposition hearing. See A.C., 74 Wn. App. at 280 (recognizing that the passage of time itself prevents any meaningful attempt to restore the circumstances existing prior to the placement decision).

Because we are reversing the disposition order as to out-of-home placement, we need not address the father's challenge that the Department failed to make reasonable efforts to prevent or eliminate the need for an out-of-home placement.[10]

Services Ordered

Because we affirm the dependency order, we next address the father's appeal of some of the court-ordered services. "The dependency statutes provide a broad framework from which the juvenile court may order services to facilitate parent-child reunification." In re Dependency of D.C.-M., 162 Wn. App. 149, 158, 253 P.3d 112 (2011). Once intervention into the family's life is authorized by the establishment of dependency, the court can require a parent to participate in a service "when the circumstances in the record support the particular service." W.W.S., 14 Wn. App. 2d at 363. The statute governing coordination of such services expressly provides that "[t]his section . . . does not create judicial authority to order the provision of services except for the specific purpose of making reasonable efforts to remedy parental deficiencies identified in a dependency proceeding under this chapter." RCW 13.34.025(2)(d); see also In re Dependency of B.F., 197 Wn. App. 579, 587, 389 P.3d 748 (2017) ("Dependency proceedings are designed to protect children from harm, help parents alleviate the problems that led to intervention, and reunite families."). "At times, such as

---

[10] The father argues the "finding of reasonable efforts was not based on substantial evidence" under RCW 13.34.130(6).

with some mental illnesses, services may be directed toward remedying both the underlying cause of the parenting deficiencies in addition to the parenting deficiencies themselves." In re Welfare of A.B., 181 Wn. App. 45, 65, 323 P.3d 1062 (2014),

We review the juvenile court's decision to order a particular service for abuse of discretion. W.W.S., 14 Wn. App. 2d at 364. The juvenile court abuses its discretion when its decision "is manifestly unreasonable or based on untenable grounds or reasons." Id.

The father challenges the court-ordered services contending that the

[r]andom UAs, drug and alcohol evaluation, psychological evaluation with a domestic violence component, and an evidence based age-appropriate parenting program—are not related to and do not address the parental deficiency the court identified as the basis for dependency. If the children's mother was the danger identified preventing reunification, the court should have required the Department to address ways to overcome that obstacle to reunification.

The court, at the dependency hearing, recognized the work that the father had previously done. The court found that

[The father] should be commended. [The father] has a history of alcohol use and admits to a history of mental health history with depression and anxiety. He has taken a lot of good steps to improve his life that not everybody would take. He testified that he went to treatment and lived there for 8 months, had positive relationships with psychiatrists and his individual counselors, and since moving to Seattle, he has looked for and found employment and this Court notes he even attended trial from his new job as well as taking days off to testify in person.

A. Random UAs and Substance Abuse Evaluation

The court ordered random UAs, requiring 90 days of clean, not missed, not diluted UAs. If any UAs were missed, positive, or diluted, the father would be required to complete a drug/alcohol evaluation and follow recommended treatment.

The court found credible Osman's testimony that he saw the father drinking and

smelled alcohol on his breath since his return to Seattle.  The father admittedly testified that he has had a previous history with alcohol use that required treatment and related criminal history such as multiple driving under the influence convictions, but has been sober since 2019.  Holmes testified that it was the combination of the father's history of alcohol use, along with reports that the father had been drinking again since returning to Seattle, along with the father's inconsistent visits with the children, that suggest a current parental deficiency.  At the disposition hearing that was held on April 29, 2022, the trial court found that "[s]ince the dependency hearing ended on March 21, 2021, the Respondent has merely had two phone calls and one face time visit with his children." The trial court "was concerned about inconsistency toward the children previously . . . and the court only sees that pattern continuing."

Even if, as the father argues, the true deficiency identified by the court was his ability to protect the children from harms caused by the mother's erratic behavior, the record suggests that alcohol use may be a current problem and an underlying cause as to his deficiency.  We conclude the trial court did not abuse its discretion in ordering random UAs and a substance use evaluation if warranted.

*B. Psychological Evaluation with Parenting and DV Component*

The court also ordered a psychological evaluation with a parenting and DV component.  The court found that it

> agrees with the GAL that the past substance abuse, mental health concerns and domestic violence allegations combined with the current reports about alcohol use and inconsistence [sic] visits create a cumulative concern. There were past concerns about [the father's] behavior with substance use, which he admits. The maternal uncle's [sic] testified that he saw [the father] drinking and smelled alcohol on his breath since his return to Seattle. Parties want to know if [the father's] medications are current. Together, these are a cumulative concern for the

84122-0-I/33

Court.

The father testified that he had been previously diagnosed with depression and anxiety and he discovered it was linked to having grown up in a war-torn part of Somalia and seeing his father killed. After being released from ICE detention, the father attended an addiction and mental health program, Southeast Homes, part of the Somalian cultural community in Minneapolis where he learned his depression and alcohol dependency were linked. The father testified that he attended sober support meetings through Zoom on Sundays. He gave the name of the University of Minnesota Clinic psychiatrist who prescribed him medications and submitted photographs of two current prescription bottles in his name. One bottle, dated "3/25/22," was labelled Quetiapine to be taken as needed for anxiety. Another bottle, dated "4/14/22," was labelled Naltrexone. Instead of a traditional therapist, the father leans on his Imam through the local mosque. This was at the recommendation of a previous therapist after the father stated he would feel more comfortable sharing his stories with someone from his culture. When Duke was asked what evidence supported a concern that the father's mental health posed a safety risk to the children in his care, Duke discussed only the father's past.

Duke, who only met the father one time, listened to the fact-finding hearing and reviewed the case summary and saw a reference to DV and a related police report. She explained that nothing demonstrated a present concern of a safety risk as to DV or the medications the father was taking. However, Duke testified it was a question of whether the father's use of the medication was being monitored and whether the DV was an area of concern that was ever addressed. Duke explained, "in my mind, there are outstanding potential threats to the children because these matters have been left

33

unaddressed." Duke said, "I would like an in-depth explanation of how [the father] has addressed his–the concerns that have been mentioned, how those have been addressed and who is treating him for those things and what those individuals say about his current state." Duke conceded she never asked the father these questions.

The DV allegation related to an incident in Wisconsin in 2016 where the father pleaded no contest to two counts of disorderly conduct for "loud boisterous conduct" that disturbed the peace. The father explained that the mother, who was then pregnant, had accused him of battery but later admitted to the prosecutor that she lied. Cervantes testified that the two CPS reports from Wisconsin contributed to her opinion that the father's mental health is a concern. But she conceded that the Department requested and received documents from Wisconsin that established the 2016 incident was not a DV incident, did not explicitly speak to the father's mental health, and did not require CPS to follow-up, and that the father had not been convicted of any DV offense. Cervantes, who supervised a visit at the mother's house with the father and all the children, testified that the children were very happy to see their parents and that in her conversations with the children about what life was like living with both parents, the children did not express a concern about DV.

The court made no findings that the father engaged in a history of acts of DV. The court expressly based its ruling on "domestic violence allegations." Despite conceding that nothing demonstrated a present concern of a safety risk as to DV, Duke testified that she did not "have any documentation that says if that-being that was an area of concern whether or not that was ever addressed." The record establishes that Duke was aware the incident in Wisconsin did not require CPS follow-up. Yet, Duke

testified that she would like an "in-depth explanation" because "in my mind, there are outstanding potential threats to the children."

The court's authority to order services is for the specific purpose of making reasonable efforts to remedy parental deficiencies identified in a dependency proceeding. RCW 13.34.025(2)(d). The court's findings do not support requiring a domestic violence component of the psychological evaluation in order to remedy an identified parental deficiency. We conclude that the court granting the Department's request for a DV component was an abuse of discretion because it was based on untenable grounds. However, because the father testified himself that his depression and alcohol dependency were linked, and, as discussed above, he was reported to have consumed alcohol, the court did not abuse its discretion in ordering a psychological evaluation. As previously discussed, the father's lack of insight as to how the mother's erratic behavior impacted the children supported the court ordering a parenting component to the evaluation.

### C. Evidence-Based Age-Appropriate Parenting Program

A Department social worker expressed her opinion that the father would benefit from an age-appropriate parenting class. Such a class had been offered to the father before the dependency hearing. While the trial judge made no order directly specifying that the father was to complete such a program, it did order "[e]vidence based in home service upon reunification (such as IFPS/Homebuilders) and follow all recommendations." To the extent such a program encompasses an evidence-based age-appropriate parenting class, the trial court did not abuse its discretion in ordering this service. The court found that "[the father] needs to learn some basic child

development to be prepared to be a sole parent.  He has never served in that role and it was apparent by his testimony."

CONCLUSION

We affirm the order of dependency, but reverse the disposition order as to the out-of-home placement and remand for further proceedings consistent with this opinion. Based on the record before us, on remand the trial court is to strike the DV component of the psychological evaluation.

_____
Coburn, J.

WE CONCUR:

_____
Chung, J.

_____
Dwyer, J.